UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 25-cv-20024-ALTMAN

VITO CORLEON VENISEE,

    *Plaintiff,*

*v.*

MIAMI-DADE COUNTY, *et al.,*

    *Defendants.*

_____/

## ORDER GRANTING MOTION TO DISMISS

On January 16, 2022, fifteen-year-old Vito Corleon Venisee (our Plaintiff) was "shot in the back of his neck" by Defendant Luke Marckioli—a Miami-Dade County police sergeant. Complaint ¶¶ 11, 15. The shot wasn't fatal, but it rendered Venisee a quadriplegic and caused other "severe and permanent injuries[.]" *Id.* ¶ 15. Venisee brought this civil-rights action under 42 U.S.C. § 1983 and Florida law against Sergeant Marckioli, Miami-Dade County, and the Miami-Dade Police Department ("MDPD"),[1] seeking recompense for "Defendant Marckioli's excessive force [causing] permanent, life-threatening injuries." *Id.* at 1. The Defendants have moved to dismiss the lawsuit, arguing that Sergeant Marckioli "is entitled to qualified immunity," that the MDPD "is not a legal entity subject to suit[,]" and that Venisee failed to state a claim against the County. Motion to Dismiss ("MTD") [ECF No. 14] at 1. The MTD has been fully briefed and is ripe for adjudication. *See* Response in Opposition

---

[1] The Miami-Dade Police Department has been renamed the "Miami-Dade Sheriff's Office." Teri Hornstein & Mauricio Maldonado, *Rosie Cordero-Stutz Sworn in as New Miami-Dade Sheriff,* CBS NEWS (Jan. 7, 2025, 10:39 PM), https://www.cbsnews.com/miami/news/new-miami-dade-sheriff-rosie-cordero-stutz-takes-oath-of-office/. Since the events that led to this case took place before the name change, however, we'll continue to refer to this entity as the MDPD.

to Defendants' Motion to Dismiss ("Response") [ECF No. 24]; Defendants' Reply in Support of Their Motion to Dismiss ("Reply") [ECF No. 25]. After careful review, we **GRANT** the MTD.[2]

### THE LAW

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To meet this "plausibility standard," a plaintiff must "plead[ ] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ibid.* (citing *Twombly*, 550 U.S. at 556). The standard "does not require 'detailed factual allegations,' but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ibid.* (quoting *Twombly*, 550 U.S. at 555). "[T]he standard 'simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence' of the required element." *Rivell v. Private Health Care Sys., Inc.*, 520 F.3d 1308, 1309–10 (11th Cir. 2008) (quoting *Twombly*, 550 U.S. at 545). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. On a motion to dismiss, "the court must accept all factual allegations in a complaint as true and take them in the light most favorable to plaintiff." *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016). "The motion is granted only when the movant demonstrates that the complaint has failed to include 'enough facts to state a claim to relief that is plausible on its face.'" *Dusek v. JPMorgan Chase & Co.*, 832 F.3d 1243, 1246 (11th Cir. 2016) (quoting *Twombly*, 550 U.S. 544, 570 (2007)).

---

[2] We'd normally begin our order by reciting the facts that are alleged in the Plaintiff's Complaint. But we'll hold off on this for now because the parties dispute whether we can consider the evidence from the officers' body cameras. *See* Response at 2 ("As a preliminary matter, references to bodyworn camera footage are improper."); Reply at 2 ("Courts may consider body camera footage at the motion to dismiss stage where the videos are 'central to the plaintiff's claim' and undisputed in terms of its authenticity." (quoting *Johnson v. City of Atlanta*, 107 F.4th 1292, 1300 (11th Cir. 2024)).

## ANALYSIS

Venisee's Complaint asserts six counts against the three Defendants. Count I alleges that Sergeant Marckioli used unreasonable and excessive force against Venisee by shooting him, in violation of § 1983. *See* Complaint ¶ 26 ("Shooting a child who is resisting arrest without violence is clearly excessive, unnecessary, and unreasonable. No reasonable police officer in [Marckioli's] position would have used this amplified degree of force."). Count II claims that the County violated § 1983 by maintaining "policies and practices exhibiting deliberate indifference to the Constitutional rights of Miami-Dade County citizens which caused the violation of [Venisee's] rights." *Id.* ¶ 31. Count III contends that the County violated the U.S. Constitution by failing to adequately train or supervise its police officers. *See id.* ¶ 43 ("This failure to train, discipline, and supervise [Marckioli] increased the risk of physical harm and constitutional violations of all constituents of Miami-Dade County[.]"). Counts IV and V aver that the MDPD negligently supervised and trained its officers in violation of Florida law. *See id.* ¶ 56 ("[MDPD's negligence supervision of Miami-Dade police officers, including [Sergeant Marckioli] was a direct and proximate cause of [Venisee's] injuries."); *id.* ¶ 62 (same, but for "negligent training"). And Count VI asserts that Sergeant Marckioli committed a common-law battery against Venisee when he "[shot] him in the back of the neck." *Id.* ¶ 65. For the following reasons, we dismiss all six counts.

### I.      The Excessive Force and Battery Claims (Counts I and VI)

Venisee's central claim—the one from which the five others flow—is that Sergeant Marckioli unreasonably shot him "as he was running away[.]" *Id.* ¶ 24. Venisee concedes that he "was a passenger in the back seat of a vehicle" that "was reported stolen" and that he fled from the police after "the driver lost control of the vehicle and crashed." *Id.* ¶¶ 11–13. But he insists that he didn't "pose a threat to any of the officers on the scene as he was running away" and that Sergeant Marckioli's decision to shoot him "was not a reasonable way to effectuate an arrest for a nonviolent crime." *Id.* ¶ 24; *see also*

*id.* ¶ 26 ("Shooting a child who is resisting arrest without violence is clearly excessive, unnecessary, and unreasonable.").

The County responds that Venisee's Complaint omits a crucial fact (depicted in the body-cam footage): When officers "repeatedly ordered Plaintiff to put his hands down or show them his hands[,]" Venisee "took out a gun." MTD at 1–2. Venisee's display of a firearm, the Defendants argue, rendered Sergeant Marckioli's use of force reasonable and entitles him to qualified immunity. *See id.* at 6 ("Faced with a noncompliant, fleeing armed suspect, who had just committed a felony, Sgt. Marckioli's use of force was objectively reasonable."). We agree with the Defendants that Sergeant Marckioli is immune under these circumstances.

### A. The Body-Worn Camera Footage

Before we reach the all-important question of qualified immunity, we need to determine whether we can consider the contents of two body-worn cameras (the "bodycams") the Defendants conventionally filed on a flash drive. *See* Notice of Conventional Filing [ECF No. 17].[3] The Defendants say that we should consider this footage under the "incorporation-by-reference" doctrine "because [the videos are]: '(1) central to the plaintiff's claims; and (2) undisputed, meaning that [their] authenticity is not challenged.'" MTD at 1 n.1 (quoting *Johnson*, 107 F.4th at 1300). The Defendants also urge us to "accept the videos' depictions as true because they contradict the allegations in the Complaint"—specifically, Venisee's claim that "he did not pose a threat to the officers when he was shot." Reply at 3–4 (citing Complaint ¶ 24). Venisee claims that we cannot consider the bodycam footage because it depicts "unverified pieces of evidence that exceed the perimeters of the Complaint[.]" Response at 2.

"Generally, when considering a motion to dismiss, the district court must limit its consideration to the pleadings and any exhibits attached to it." *Baker v. City of Madison, Ala.*, 67 F.4th

---

[3] Like the Defendants, we'll refer to the two bodycams as BWC 1 and BWC 2.

1268, 1276 (11th Cir. 2023) (citing *Grossman v. Nationsbank, N.A.*, 225 F.3d 1228, 1231 (11th Cir. 2000)). We also (usually) "must accept all factual allegations in [the] complaint as true and take them in the light most favorable to plaintiff." *Dusek*, 832 F.3d at 1246. But the "incorporation-by-reference" doctrine "permit[s] district courts to consider materials outside a complaint at the motion-to-dismiss stage." *Baker*, 67 F.4th at 1276. "[A] court may properly consider a document not referred to or attached to a complaint under the incorporation-by-reference doctrine if the document is (1) central to the plaintiff's claims; and (2) undisputed, meaning that its authenticity is not challenged." *Johnson*, 107 F.4th at 1300. "[W]here a video is clear and obviously contradicts the plaintiff's alleged facts, we accept the video's depiction instead of the complaint's account, and view the facts in the light depicted by the video." *Baker*, 67 F.4th at 1277–78 (cleaned up) (first citing *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2010); and then citing *Scott v. Harris*, 550 U.S. 372, 381 (2007)); *see also Brooks v. Miller*, 78 F.4th 1267, 1278 (11th Cir. 2023) ("So if a valid recording completely and clearly contradicts a party's testimony, the testimony is not credible, and the court should disregard it.").

The Defendants have met both elements of the incorporation-by-reference doctrine here. *First*, the videos are indisputably central to Venisee's claims. Venisee's claims all arise from the night of January 16, 2022, when Sergeant Marckioli shot him as he "was fleeing on foot [and] being chased by armed officers[.]" Complaint ¶ 25. Both videos depict this same chase and the shooting. *See Johnson*, 107 F.4th at 1301 ("The body camera and dashcam footage clearly depict the events that are central to Johnson's claims. The bodycam footage shows Rolfe's interaction with Johnson from the time he pulled Johnson over through him placing Johnson in the back of his patrol vehicle."); *Baker*, 67 F.4th at 1277 ("[T]he body camera footage depicts the events that are central to Baker's claims. The footage shows all the relevant conduct[.]"). *Second*, Venisee hasn't meaningfully challenged the authenticity of the footage. Although Venisee uses conclusory catchphrases like "unverified" and "contested" to describe the videos, Response at 2–3, he never actually "argue[s] that the videos were altered in any

way or [that they] do not depict what actually happened[.]" *Johnson*, 107 F.4th at 1301. Venisee appears to suggest that the footage is "contested" because "the actual shooting is not visible on the video." Response at 2–3. But the Eleventh Circuit has rejected a similar argument, holding that "incomplete" bodycam videos can still be considered under the incorporation-by-reference doctrine so long as "they clearly show unedited footage of the event underlying [the plaintiff's] excessive force claim." *Swinford v. Santos*, 121 F.4th 179, 188 (11th Cir. 2024). In short, we can (and will) consider both bodycam videos because they depict the incident in question and haven't been "altered in any way[.]" *Johnson*, 107 F.4th at 1301.

Venisee advances two additional arguments against our consideration of the videos—both unpersuasive. *First*, Venisee observes that his "account of the subject events as alleged in the Complaint differs greatly from Defendants' characterization of the events in their Motion to Dismiss" and says that we must defer to his version. Response at 3. While we would normally take this approach at the motion-to-dismiss stage, the Eleventh Circuit has told us to defer to available video evidence when it plainly contradicts the plaintiff's allegations. *See Baker*, 67 F.4th at 1278 ("In sum, while reviewing the district court's ruling on the defendants' motions to dismiss, we have credited, as we must, Baker's factual allegations where no obviously contradictory video evidence is available. But the footage plainly contradicts Baker's alleged version of events, leading us to view most of the facts as depicted by the video.").

*Second*, Venisee implies that it would be unfair for us to consider the bodycam videos without first giving him the opportunity to conduct discovery. *See* Response at 3 ("Defendants' Motion incites an untimely factual dispute, knowing Plaintiff's Counsel is at a loss without discovery."). This argument fails for two reasons. *One*, "the purpose of discovery is to find out additional facts about a well-pleaded claim, not to find out whether such a claim exists." *Clearwater Consulting Concepts, LLP v. Imperial Premium Fin., LLC*, 2010 WL 916392, at *1 (S.D. Fla. Mar. 11, 2010) (Marra, J.). *Two*, it would

be much more unfair to force the Defendants to engage in discovery when there's good reason to believe they're entitled to immunity. *See Johnson v. Breeden*, 280 F.3d 1308, 1317 (11th Cir. 2002) ("Because of the purpose served by the doctrine of qualified immunity, a valid defense based upon it must be recognized as soon as possible, preferably at the motion to dismiss or summary judgment stage of the litigation."); *Blinco v. Green Tree Serv., LLC*, 366 F.3d 1249, 1252 (11th Cir. 2004) ("[Q]ualified immunity protects government officials not only from having to stand trial, but from having to bear the burdens attendant to litigation, including pretrial discovery.").

Since we may consider the bodycam footage, we'll now supplement Venisee's allegations with the videos themselves. Venisee admits that he "was a passenger in the back seat of a [stolen] vehicle being followed by law enforcement." Complaint ¶ 11. He also concedes that, after the driver crashed, he "exited the vehicle and began running" from the police. *Id.* ¶ 14. But he insists that he didn't pose a danger to the officers and "adamantly denies holding a handgun upon exiting the vehicle." Response at 3. The bodycams tell a different story. Once Venisee and the driver fled the vehicle, one officer immediately noticed that Venisee was holding a firearm. *See* BWC 2 at 1:34–1:35 ("He's got a gun!"). Officers repeatedly and loudly commanded Venisee to show his hands while giving chase. *See* BWC 1 at 0:22–0:24 ("Hey, get [or put] your fucking hands down!"); BWC 2 at 1:30–31 ("Show me your hands . . . ."). While giving chase, one of the officers (presumably Sergeant Marckioli given the Complaint's allegations) noticed the gun, drew his weapon, and shot Venisee—all within a span of about two seconds. *See* BWC 1 at 0:26–0:28 (yelling "gun, gun, gun!" before discharging the firearm). Once Venisee was incapacitated, multiple officers confirmed that he had a gun. *See* BWC 1 at 0:29–0:31 (repeating "he's got a gun" three times); BWC 2 at 1:44–1:46 (depicting same event). The gun was later secured by law enforcement, *see* BWC 2 3:14–3:16, 8:58–9:00, and is even briefly visible on BWC 2 once the scene is secured, *see id.* at 18:13–18:18.

These bodycam videos (to be sure) aren't perfect. Because the events took place at night—and since the officers were in hot pursuit of fleeing suspects—much of the footage immediately preceding the shooting is blurry. But the audio of these crucial moments and the post-shooting video footage could not be clearer: The officers believed (accurately, as it turns out) that Venisee possessed a firearm—and, despite repeated commands from the officers, Venisee failed to comply and show his hands.

### B.  Sergeant Marckioli is Entitled to Qualified Immunity

Having found that we can consider both the Complaint and the bodycam footage at this stage of the proceedings, we can now conduct a qualified-immunity analysis. The Defendants argue that Sergeant Marckioli's "use of force was reasonable" because he was "in pursuit of an armed suspect who had fled on foot from the police in a stolen car and who had committed a felony in their presence—occupying a stolen vehicle." MTD at 5. And, they continue, even if the officer's use of force arguably violated Venisee's constitutional rights, "there was no binding case law in existence when this incident occurred that would have put a reasonable officer on notice that shooting a suspect under similar circumstances would subject that officer to liability under the Fourth Amendment." *Id.* at 7–8. Venisee responds that he couldn't have "pose[d] an imminent threat of physical harm to Sergeant Marckioli, any of the other officers, or the public" because he "did not point a weapon or threaten to use a weapon" and was merely "running away" from Sergeant Marckioli and the other officers. Response at 4. He also cites *Tennessee v. Garner*, 471 U.S. 1 (1985), as clearly establishing that "an officer is not permitted to use deadly force where there is no threat of harm." *Id.* at 6 (citing *Garner*, 471 U.S. at 3).[4]

---

[4] Venisee also references two district court opinions: *Fitch v. Scott*, 2005 WL 1925028, at *7 (M.D. Fla. Aug. 10, 2005) (Steele, J.), and *Salgado v. City of West Miami*, 85 F. Supp. 3d 1332, 1341 (S.D. Fla. 2015) (King, J.). But, in our District, only the "decisions of the United States Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state (here, the Supreme Court of Florida) can clearly establish the law." *McClish v. Nugent*, 483 F.3d 1231, 1237

"To invoke the defense of qualified immunity, a government official must have been acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Spencer v. Benison*, 5 F.4th 1222, 1230 (11th Cir. 2021). If the government official was acting within the scope of his discretionary authority, "the burden shifts to the plaintiff to show that the official's conduct (1) violated federal law (2) that was clearly established at the relevant time." *Ibid.* To qualify as clearly established, a legal principle "must be established with obvious clarity by the case law so that every objectively reasonable government official facing the circumstances would know that the official's conduct did violate federal law when the official acted." *Bradley v. Benton*, 10 F.4th 1232, 1242 (11th Cir. 2021) (quoting *Waldron v. Spicher*, 954 F.3d 1297, 1305 (11th Cir. 2020)). "Put another way, the defendant must have fair notice of his conduct's unconstitutionality which derives from one of the following sources: (1) the obvious clarity of constitutional or statutory language; (2) broad holdings or statements of principle in case law that are not tied to particularized facts; or (3) fact-specific judicial precedents that are not fairly distinguishable." *Eloy v. Guillot*, 289 F. App'x 339, 346 (11th Cir. 2008) (cleaned up). The parties agree that Sergeant Marckioli "was acting in his capacity as a MDPD sergeant at the time of the incident." MTD at 4; *see also* Complaint ¶ 7 ("At all times material hereto, Officer Marckiolo [sic] was acting under color of state law, within the course and scope of his employment with Miami-Dade County."). We must therefore determine whether Sergeant Marckioli violated Venisee's clearly established constitutional right. *See Spencer*, 5 F.th at 1230.

We'll start with the basics. Being shot by a police officer (as Venisee was) constitutes a "seizure" under the Fourth Amendment. *See Torres v. Madrid*, 592 U.S. 306, 318 (2021) ("[T]he officers' shooting applied physical force to [the plaintiff's] body and objectively manifested an intent to restrain her from driving away. We therefore conclude that the officers seized Torres for the instant that the

---

(11th Cir. 2007); *see also* Reply at 7 ("[*Fitch* and *Salgado*] are district court decisions that cannot establish law for purposes of the qualified immunity analysis." (citing *Thomas ex rel. Thomas v. Roberts*, 323 F.3d 950, 953 (11th Cir. 2003)).

bullets struck her."). The Fourth Amendment also "governs 'a free citizen's claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other seizure of his person.'" *Corbitt v. Vickers*, 929 F.3d 1304, 1313 (11th Cir. 2019) (quoting *Graham v. Connor*, 490 U.S. 386, 388 (1989)).

The Supreme Court in *Graham* held that "reasonableness" is an objective inquiry based on "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." 490 U.S. at 396. "The reasonableness of force used can depend on a number of factors[,]" such as "the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight." *Cantu v. City of Dothan, Ala.*, 974 F.3d 1217, 1229 (11th Cir. 2020) (cleaned up) (quoting *Graham*, 490 U.S. at 396). An officer's use of "deadly force" is reasonable if "the officer had probable cause to believe that the suspect posed a threat of 'serious physical harm' to the officer or others, and whether the officer had given the suspect a warning about the use of deadly force, if doing so was feasible." *Ibid.* (citing *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009)); *see also Garner*, 471 U.S. at 11 ("Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force."). As the Supreme Court recently reiterated, the "inquiry into the reasonableness of police force requires analyzing the 'totality of the circumstances,'" and we must be mindful that "earlier facts and circumstances may bear on how a reasonable officer would have understood and responded to later ones." *Barnes v. Felix*, 2025 WL 1401083, at *4 (U.S. May 15, 2025).

Based on this precedent, we conclude that Sergeant Marckioli didn't violate Venisee's constitutional rights when he shot him in the neck. When we take the allegations of the Complaint and the events depicted in the bodycam together, we conclude that Marckioli knew the following facts before he shot Venisee: (1) Venisee "was a passenger" in a vehicle that was "reported stolen,"

Complaint ¶¶ 11–12; (2) the stolen vehicle fled from police and did not stop until the driver crashed, *see id.* ¶ 13 ("All of the passengers exited the vehicle and began running."); (3) Venisee and the driver immediately fled on foot after the crash, *see generally* BWC 1; BWC 2; (4) Venisee didn't comply with repeated, loud verbal commands from the officers to show his hands while they were chasing him, *see* BWC 1 at 0:22–0:24; BWC 2 at 1:30–1:31; and (5) multiple officers (correctly) perceived that Venisee was displaying a firearm and that he refused to put the gun down despite receiving clear verbal commands to do so, *see* BWC 1 at 0:26–0:28; BWC 2 at 1:34–1:35. The law is well-settled that the use of deadly force is reasonable "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others[.]" *Garner*, 471 U.S. at 11; *see also Singletary v. Vargas*, 804 F.3d 1174, 1181 (11th Cir. 2015) ("As to deadly force, a police officer may use such force to dispel a threat of serious physical harm to either the officer or others, or to prevent the escape of a suspect who threatens this harm.").

And the Eleventh Circuit has confirmed that a reasonable officer is justified in using deadly force to apprehend a fleeing suspect who has access to a firearm. *See Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) ("A suspect of violent crimes who had attempted to elude Officer Gutierrez suddenly confronted Officer Gutierrez. The suspect was armed and posed a threat of serious physical injury to Officer Gutierrez and to citizens in the surrounding residential area. . . . Officer Gutierrez reasonably perceived the situation as an ambush that required the use of deadly force."); *Montoute v. Carr*, 114 F.3d 181, 185 (11th Cir. 1997) ("We accept for the present purposes that, once past Sergeant Carr, Montoute never turned to face him again, and Montoute never actually pointed the sawed-off shotgun at anyone. But there was nothing to prevent him from doing either, or both, in a split second. At least where orders to drop the weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force."). As our recitation of the facts should make plain, a reasonable officer could have seen Venisee—fleeing

from a stolen vehicle, holding a firearm, and refusing to put it down despite repeated commands from the officers—as a similarly serious threat of harm to himself and to others. *See Jean-Baptiste*, 627 F.3d at 821 ("Officer Gutierrez was entitled to qualified immunity if he reasonably could have believed that probable cause existed, in light of the information he possessed, to shoot Jean–Baptiste, even if that belief was mistaken." (cleaned up)).

Venisee tries to distinguish these cases and insists that he "was not accused or suspected of any crime, was not running towards Officer Marckioli with a weapon, was half his size, and did not assert any desire or intention to harm him or anyone else." Response at 5. But Venisee fails to grapple with the all-important fact that he displayed a firearm after he and another suspect led police officers on a protracted chase in a stolen car. It's true, of course, that "the mere presence of a gun or other weapon is not enough to warrant the exercise of deadly force and shield an officer from suit." *Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016). And the bodycam footage doesn't reveal whether Venisee merely brandished the gun or, instead, whether he aimed it at the pursuing officers. *See* BWC 1 at 0:26–0:28. But the "the reasonableness of [Marckioli's] force depends on the threat posed by [Venisee's] access to his firearm . . . . So when an officer confronts an armed suspect 'in a tense and dangerous situation,' the law does not require the officer to 'hope for the best' and 'wait until the moment a suspect uses a deadly weapon to stop the suspect.'" *Jones v. Ceinski*, __ F.4th ___, 2025 WL 1338079, at *4 (11th Cir. May 8, 2025) (quoting *Jean-Baptiste*, 627 F.3d at 821). Venisee and another suspect were in a stolen car and fled from the police (both in the vehicle and later on foot) *before* Officer Marckioli realized Venisee had a gun. *See* BWC 1 at 0:26–0:28; BWC 2 at 1:34–1:35. Venisee then "refus[ed] to drop the gun and show his hands after being repeatedly ordered to do so by the police officers." MTD at 5; *see also* BWC 1 at 0:22–0:24; BWC 2 at 1:30–1:31. Faced with an armed, recalcitrant suspect who was actively fleeing police—and who had just jumped out of a stolen vehicle—Officer Marckioli didn't need to wait and see whether Venisee would discharge the firearm

before using deadly force to subdue him. *See Montoute*, 114 F.3d at 185 ("At least where orders to drop the weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force."); *Jean-Baptiste*, 627 F.3d at 821 ("Regardless of whether Jean–Baptiste had drawn his gun, Jean–Baptiste's gun was available for ready use, and Gutierrez was not required to wait and hope for the best." (cleaned up)); *Garczynski v. Bradshaw*, 573 F.3d 1158, 1169 (11th Cir. 2009) ("Garczynski repeatedly disobeyed the officers' orders, first to show his hands and then to drop his gun. These factors, even assuming that Garczynski never pointed the gun at the officers, provided a sufficient basis for the officers reasonably to believe that Garczynski posed an immediate risk of serious harm to them.").[5]

Finally, even if Officer Marckioli *had* violated Venisee's constitutional right, that right wasn't *clearly established*. A right isn't "clearly established" unless "existing precedent [places] the statutory or constitutional question beyond debate," such that "every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11–12 (2015) (cleaned up). Venisee says that the Supreme Court in *Garner* "clearly held that an officer is not permitted to use deadly force where there is no threat of harm." Response at 6; *accord Perez*, 809 F.3d at 1222 ("Arango's Fourth Amendment right to be free from the use of deadly force when compliant and nonresistant

---

[5] Venisee objects to the Defendants' attempts to cast him as a suspected felon or an accessory to a felony. *See* Response at 4–5 ("Unknowingly sitting in the backseat of a stolen vehicle is not a crime, and is certainly not a felony. Vito was not, nor was he suspected to be the driver of the stolen vehicle. At all times material hereto, the officers did not have reason to believe that Vito was aware the car was stolen."). This argument misses the point. The reasonableness of an officer's force is "objective" and is based on the totality of the circumstances; in other words, we ask only whether "the officers' actions [were] 'objectively reasonable' in light of the facts and circumstances confronting them." *Graham*, 490 U.S. at 397. Whether Venisee *subjectively* knew that he was in a stolen car is thus totally irrelevant because a reasonable officer in Sergeant Marckioli's shoes would have observed that Venisee was in a stolen car, that he fled from the police, that he was carrying a gun, and that he refused to comply with loud commands to show his hands. An officer in these same circumstances could easily believe that Venisee "pose[d] an immediate danger to the officer or others," even if Venisee never intended to use the gun and was unaware that he was riding in a stolen car. *Jean-Baptiste*, 627 F.3d at 821.

was clearly established well before the night of the shooting in 2012."). That's true, but *Garner* also held that an officer *can* use deadly force when "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others[.]" 471 U.S. at 11.

With this principle in mind, the Eleventh Circuit has repeatedly held that police officers *can* use deadly force against an armed suspect who *either* has fled from the police *or* is not complying with lawful commands. *See Jean-Baptiste*, 627 F.3d at 821 ("Officer Gutierrez found himself in a precarious situation. A suspect of violent crimes who had attempted to elude Officer Gutierrez suddenly confronted Officer Gutierrez. The suspect was armed and posed a threat of serious physical injury to Officer Gutierrez and to citizens in the surrounding residential area."); *Garczynski*, 573 F.3d at 1169 ("Garczynski repeatedly disobeyed the officers' orders, first to show his hands and then to drop his gun. These factors, even assuming that Garczynski never pointed the gun at the officers, provided a sufficient basis for the officers reasonably to believe that Garczynski posed an immediate risk of serious harm to them."); *Montoute*, 114 F.3d at 185 ("We accept for the present purposes that, once past Sergeant Carr, Montoute never turned to face him again, and Montoute never actually pointed the sawed-off shotgun at anyone. But there was nothing to prevent him from doing either, or both, in a split second. At least where orders to drop the weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force."). In our case, of course, we have *both*: Venisee, an armed suspect, had fled from police *and* was refusing to comply with lawful commands. We thus agree with the Defendants that there's no "binding precedent holding the force used here by Sgt. Marckioli is clearly excessive in dealing with an armed, fleeing suspect who had just committed a felony and was resisting arrest while running with a gun in a public street." MTD at 8. In fact, we think a reasonable officer would almost certainly draw the opposite conclusion. *See Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) ("In the context of Fourth Amendment excessive force claims, we have noted that generally no

14

bright line exists for identifying when force is excessive; we have therefore concluded that unless a controlling and materially similar case declares the official's conduct unconstitutional, a defendant is usually entitled to qualified immunity.").

Because Sergeant Marckioli didn't use excessive force against Venisee, the state-law battery claim Venisee pled in Count VI necessarily fails. "Battery claims for excessive force under Florida law are 'analyzed by focusing upon whether the amount of force used was reasonable under the circumstances.' [We apply] the same Fourth Amendment excessive force analysis to a battery claim against an officer under Florida law." *Baxter v. Santiago-Miranda*, 121 F.4th 873, 891–92 (11th Cir. 2024) (quoting *Kimbrel v. Clark*, 385 So. 3d 1124, 1128 (Fla. 1st DCA 2024)); *see also City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996) ("If excessive force is used in an arrest, the ordinarily protected use of force by a police officer is transformed into a battery."). In short, because "[Sergeant Marckioli's] use of force was not excessive, [Venisee's] battery claim[ ] fail[s] as well." *Baxter*, 121 F.4th at 891.

*      *      *

The Supreme Court has repeatedly said that qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Given the facts of this case, we find that Sergeant Marckioli's decision to shoot Venisee wasn't the product of incompetence or deliberate indifference to the law. Because Sergeant Marckioli is entitled to qualified immunity—and isn't liable for battery under Florida law—we **DISMISS** Counts I and VI of the Complaint.

## II.    The Municipal-Liability Claims (Counts II and III)

Counts II and III of the Complaint allege that the County "maintained policies and practices exhibiting deliberate indifference to the Constitutional rights of Miami-Dade County citizens which caused the violation of Vito Corleon Venisee's rights." Complaint ¶ 31. As to Count II, Venisee insists

that the County has a "decades-long practice of using excessive force" and that it refused to "remediate [this] longstanding practice[.]" *Id.* ¶¶ 34–35. Similarly, Venisee claims in Count III that the County's "failure to properly train, discipline, and supervise Defendant Marckioli, demonstrates deliberate indifference to the rights and safety of the citizens of Miami-Dade County, including [Venisee]." *Id.* ¶ 42. The Defendants counter that Venisee's allegations lack a "sufficient factual predicate" and therefore cannot establish municipal liability under § 1983. MTD at 10. We agree.

"[U]nder § 1983, local governments are responsible for their own illegal acts. They are not vicariously liable for their employees' actions." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (cleaned up). "It is only when the execution of the government's policy or custom inflicts the injury that a municipality may be held liable under § 1983." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 385 (1989) (cleaned up). Thus, to impose municipal liability under § 1983, the plaintiff must show: "(1) that his constitutional rights were violated; (2) that the municipality had a custom or policy that constituted deliberate indifference to that constitutional right; and (3) that the policy or custom caused the violation." *McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004) (citing *City of Canton*, 489 U.S. at 388). "The Supreme Court has held that 'official municipal policy includes the decisions of a government's lawmakers, the acts of its policy making officials, and practices so persistent and widespread as to practically have the force of law.'" *Purcell v. City of Ft. Lauderdale*, 753 F. Supp. 3d 1308, 1342 (S.D. Fla. 2024) (Altman, J.) (cleaned up) (quoting *Connick*, 563 U.S. at 61); *see also Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc) ("A plaintiff . . . has two methods by which to establish a [municipal] policy: identify either (1) an officially promulgated [municipal] policy or (2) an unofficial custom or practice of the [municipality] shown through the repeated acts of a final policymaker for the [municipality].").

Venisee's municipal liability claim (Count II) fails for two reasons. *First*, Sergeant Marckioli didn't use excessive force, *see ante*, at 10–13, so Venisee can't show that "his constitutional rights were

16

violated" by anyone (let alone by the County), *McDowell*, 392 F.3d at 1289. *Second*, Venisee comes nowhere close to alleging that the County "had a custom or policy that constituted deliberate indifference to that constitutional right[.]" *Ibid.* To be sure, Venisee offers conclusory allegations that the County maintains several nefarious policies—*viz.*, that it "inadequately and improperly investigate[s] citizen complaints of police misconduct[,]" "inadequately train[s] and supervise[s] its police officers," "fail[s] to remediate the longstanding practice of Miami-Dade police officers using excessive force[,]" and "fail[s] to evaluate the widespread use of excessive force, sufficiently reprimand and discipline officers for their unlawful use of excessive force, and alter the policy and practice of condoning excessive force within the [MDPD]." Complaint ¶¶ 32–34, 46. But a plaintiff can't simply allege that a municipality maintains unconstitutional policies and customs and call it a day; he must support this accusation with "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *see also Hall v. Smith*, 170 F. App'x 105, 107–08 (11th Cir. 2006) ("Vague and conclusory allegations will not support a claim under § 1983." (citing *Marsh v. Butler*, 268 F.3d 1014, 1036 n.16 (11th Cir. 2001))); *Thomas v. City of Americus, Ga.*, 2023 WL 2485464, at *3 (11th Cir. Mar. 14, 2023) ("[The plaintiff's] claim rests on a conclusory allegation that the city 'apparently had a custom or policy not to intervene in cases of domestic violence.' This is insufficient."); *Cluff v. Miami-Dade Cnty.*, 2022 WL 700971, at *4 (S.D. Fla. Feb. 1, 2022) (Williams, J.) ("Plaintiffs cannot manufacture a County or Miami-Dade Fire custom based on broad-sweeping conclusory statements without citation to any supporting documents or other specific examples indicative of such a custom."), *aff'd*, 2022 WL 16757095 (11th Cir. Nov. 8, 2022). The only "evidence" Venisee presents to support his municipal-liability claims is his own shooting, but "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability[.]" *Craig v. Floyd Cnty., Ga.*, 643 F.3d 1306, 1310 (11th Cir. 2011) (cleaned up).

Venisee's constitutional failure-to-train claim (Count III) fails for similar reasons. "[M]unicipal liability also may be based on a claim of inadequate training 'where a municipality's failure to train its employees in a relevant respect evidences a deliberate indifference to the rights of its inhabitants such that the failure to train can be properly thought of as a [municipal] policy or custom that is actionable under § 1983.'" *Sewell v. Town of Lake Hamilton*, 117 F.3d 488, 489–90 (11th Cir. 1997) (cleaned up) (quoting *City of Canton*, 489 U.S. at 389). To show this "deliberate indifference," Venisee "must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998). Again, the only allegations in the Complaint showing that the County "knew" of a need to train its officers is Venisee's own personal experience with Sergeant Marckioli and his conclusory statement that the County "failed to evaluate the widespread use of excessive force, sufficiently reprimand and discipline officers for their unlawful use of excessive force, and alter the policy and practice of condoning excessive force within the [MDPD]." Complaint ¶ 46. As with Count II, bare allegations of the County's allegedly lackadaisical training programs are insufficient to state a claim as a matter of law. *See Keith v. DeKalb Cnty., Ga.*, 749 F.3d 1034, 1053–54 (11th Cir. 2014) ("As the Supreme Court has indicated, 'a supervisor's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.' Keith's claim that Sheriff Brown violated Cook's constitutional rights by failing to adequately train detention officers is especially tenuous because not only does she fail to demonstrate that Sheriff Brown was on notice, she also fails to demonstrate how 'better training' would have prevented the incident leading to Cook's death." (cleaned up) (quoting *Connick*, 563 U.S. at 61)).

Perhaps cognizant of these flaws, Venisee "requests the opportunity to amend this complaint to address [these] factual deficiencies." Response at 8. As an initial matter, "a plaintiff who wishes to amend his complaint must file a motion seeking leave to do so"; he can't (as Venisee has done here)

simply "request . . . leave to file a amended complaint . . . [in] an opposition memorandum[.]" *Doe v. Emory Univ.*, 110 F.4th 1254, 1263 n.3 (11th Cir. 2024) (cleaned up). This defect aside, we wouldn't grant Venisee leave to amend even if his request were procedurally proper. A district court may deny a motion to amend "(1) where there has been undue delay, bad faith, dilatory motive, or repeated failure to cure deficiencies by amendments previously allowed; (2) where allowing amendment would cause undue prejudice to the opposing party; or (3) where amendment would be futile." *Bryant v. Dupree*, 252 F.3d 1161, 1163 (11th Cir. 2001) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). A request to amend is "futile" if "an amended complaint would still fail at the motion-to-dismiss or summary-judgment stage." *L.S. ex rel. Hernandez v. Peterson*, 982 F.3d 1323, 1332 (11th Cir. 2020). For two reasons, we find that any attempt to amend Counts II and III would be futile.

*First*, as we've said, the limited record before us is sufficient to show that Sergeant Marckioli didn't deploy excessive force against Venisee. *See ante*, at 10–13, 16. Since Sergeant Marckioli never violated Venisee's constitutional rights, there can be no causal connection between Venisee's injuries and the County's allegedly unconstitutional customs or training policies. *See McDowell*, 392 F.3d at 1289 ("[A] plaintiff must show . . . that his constitutional rights were violated [and] that the [municipal] policy or custom caused the violation."). *Second*, Venisee appears to admit that he can't plead additional facts without the benefit of discovery. *See* Response at 8 ("Without the benefit of discovery, Plaintiff is at an unenviable disadvantage."). While we appreciate his frustration, Venisee can't simply allege that the County has an unconstitutional policy or custom and then hope that discovery will later substantiate his claim. *See Iqbal*, 556 U.S. at 678–79 ("[Rule 8] does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."); *Sovereign Bonds Exch. LLC v. Fed. Republic of Ger.*, 2011 WL 13100214, at *2 (S.D. Fla. Aug. 9, 2011) (Altonaga, J.) ("Parties may not file insufficient complaints with the hope of receiving discovery to make them sufficient.").

Because Venisee has failed to allege that the County can be held liable under § 1983—and since any attempt to amend his Complaint would be futile—we **DISMISS** Counts II and III.

### III.     The Negligent-Training and Negligent-Supervision Claims (Counts IV and V)

In his final two counts, Venisee alleges that the MDPD negligently trained and supervised Sergeant Marckioli in violation of Florida law. *See* Complaint ¶ 56 ("[MDPD's] negligent supervision of Miami-Dade Police officers, including [Marckioli] was a direct and proximate cause of [Venisee's] injuries."); *id.* ¶ 61 ("Upon information and belief, the training provided to law enforcement officers at the Miami-Dade Police Department was brief, incomplete, and adversely impacted by guidance from other improperly trained officers, including those in positions of leadership."). The Defendants initially asked us to dismiss these claims because "police departments are not legal entities amenable to suit." MTD at 15 (quoting *Williams v. Miami-Dade Police Dep't*, 297 F. App'x 941, 945 (11th Cir. 2008)). Venisee, to his credit, concedes this point, but he asks us for permission to amend so that he can assert Counts IV and V against the County instead. *See* Response at 8 ("Plaintiff concedes that based on precedent, [the MDPD] cannot be sued. The allegations asserted against [MDPD] in Counts IV and V are more appropriately attributed to Defendant Miami-Dade County. Accordingly, Plaintiff requests permission to amend the complaint to cure this deficiency."). The Defendants then asked us to dismiss Counts IV and V *anyway* because "leave to amend . . . would be futile[.]" Reply at 9.[6] Here, again, we agree with the Defendants.

As to these two counts, any amendment would be futile because Venisee cannot assert state-law, negligent-supervision and negligent-training claims against the County. Starting with negligent supervision, "a plaintiff must establish that the employer owed a legal duty to the plaintiff to exercise

---

[6] Because Venisee's request to amend is improper, we could dismiss Counts IV and V on this basis alone. *See Doe*, 110 F.4th at 1263 n.3 ("Under our precedent, where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly. Rather, a plaintiff who wishes to amend his complaint must file a motion seeking leave to do so." (cleaned up)).

reasonable care in hiring and retaining safe and competent employees." *Thomas v. Indian River Cnty. Sheriff's Dep't*, 2021 WL 12171820, at *5 (S.D. Fla. Oct. 4, 2021) (Marra, J.). But this tort "requires that the actions of the employee be outside the course and scope of the employee's employment." *City of Boynton Beach v. Weiss*, 120 So. 3d 606, 610 (Fla. 4th DCA 2013); *see also Poulin v. Bush*, 650 F. Supp. 3d 1280, 1307 (M.D. Fla. 2023) (Jung, J.) ("A claim for negligent retention and supervision requires an employee's wrongful conduct to have been committed outside the scope of employment.").[7] There's no dispute that Sergeant Marckioli "was acting . . . within the scope of his employment with Miami-Dade County" when he shot Venisee, so the County cannot be liable for negligently supervising Sergeant Marckioli at the time of the shooting. Complaint ¶ 7.

Venisee's negligent-training claim fares no better. "A plaintiff asserting a negligent training claim must allege that it was harmed as a result of an employer's failure to adequately train an employee, and that the nature of the employment put the plaintiff in a 'zone of risk' such that the employer had a duty running to the plaintiff." *Adler v. WestJet Airlines, Ltd.*, 31 F. Supp. 3d 1381, 1388 (S.D. Fla. 2014) (Cohn, J.). Unfortunately for Venisee, a Florida municipality is "immune from tort liability based upon actions that involve its 'discretionary' functions, such as development and planning of governmental goals and policies." *Lewis v. City of St. Petersburg*, 260 F.3d 1260, 1266 (11th Cir. 2001). Both Florida and federal courts have concluded that municipalities are immune under Florida law from suits alleging that they negligently trained their police officers. *See Gualtieri v. Bogle*, 343 So. 3d 1267, 1276 (Fla. 2d DCA 2022) ("Here, the pertinent allegations in count three clearly relate to the Sheriff's decisions of how to train his deputies and what subject matter to include in said training. These alleged deficiencies in the Sheriff's training of his deputies involve discretionary, planning-level functions for which the Sheriff is entitled to sovereign immunity."); *see also Lewis*, 260 F.3d at 1266 ("A

---

[7] "The terms 'negligent supervision' and 'negligent retention' are essentially interchangeable" under Florida law. *Watts v. City of Hollywood, Fla.*, 146 F. Supp. 3d 1254, 1262 n.4 (S.D. Fla. 2015) (Altonaga, J.).

city's decision regarding how to train its officers and what subject matter to include in the training is clearly an exercise of governmental discretion regarding fundamental questions of policy and planning. . . . [T]he 'discretionary' function exception to the waiver of sovereign immunity applies and her claim is barred."); *Whitaker v. Miami-Dade Cnty.*, 126 F. Supp. 3d 1313, 1331 (S.D. Fla. 2015) (Lenard, J.) (same). In sum, sovereign immunity bars Venisee from advancing a state-law negligent-training claim against the County.

Counts IV and V of the Complaint are against a Defendant that cannot be sued (MDPD). And we won't give Venisee leave to fix this mistake because the County cannot be sued for negligent supervision or negligent training under these circumstances. Counts IV and V are therefore **DISMISSED**.

CONCLUSION

After careful review, we hereby **ORDER and ADJUDGE** as follows:

1. The Defendants' Motion to Dismiss [ECF No. 14] is **GRANTED**. Venisee's Complaint [ECF No. 1] is **DISMISSED**.

2. All deadlines and hearings are **TERMINATED**, and any other pending motions are **DENIED as moot**.

3. This case shall remain **CLOSED**.

**DONE AND ORDERED** in the Southern District of Florida on May 28, 2025.

_____
**ROY K. ALTMAN**
**UNITED STATES DISTRICT JUDGE**

cc:     counsel of record